**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **RONALD ADRIN GRAY,**<br><br>**Petitioner,**<br><br>**v.**<br><br>**COLONEL ANDREW SERGENT,**<br><br>**Respondent.** | **Case No. 5:18-cv-03305-HLT** |

## MEMORANDUM AND ORDER

Petitioner Ronald Gray is a military prisoner at the United States Disciplinary Barracks at Fort Leavenworth, Kansas. A military jury convicted Gray in 1988 of two premeditated murders, one attempted murder, and nine other crimes.[1] The military court sentenced him to reduction in rank, forfeiture of pay and allowances, dishonorable discharge, and death. Gray unsuccessfully pursued relief in the military courts and now brings this petition for federal habeas corpus relief under 28 U.S.C. § 2241, which empowers federal courts "to entertain habeas petitions from military prisoners." *See Santucci v. Commandant*, 66 F.4th 844, 853 (10th Cir. 2023).

The Court appreciates the significance of this case and the impact of this decision both on the individuals personally involved and on military death penalty habeas law. A death sentence—no matter the criminal conduct precipitating its imposition—is the gravest form of criminal liability the government can impose. There is no exercise of government authority over an individual that is more severe or permanent. Very few petitioners are under sentence of death. And the uncommon nature of the death penalty in military courts means that there is not a broad or well-developed

---

[1] This case involves civilian courts and military courts; each court system uses its own terminology. A civilian court has a jury, but a military court has a panel. What civilian courts call a prosecutor, military courts call trial counsel. For ease of understanding, the Court will use the terminology generally used in civilian courts.

body of caselaw for this Court to consult to easily resolve the gravely important issues now before it. Moreover, this case is unique because Gray committed the crimes involved between December 1986 and January 1987—nearly 40 years ago. Both the Uniform Code of Military Justice ("UCMJ") and the understanding of the United States Constitution have changed in that time, leaving this Court with a singularly complex procedural history to unravel.

The Court carefully considered all the information before it and addresses the principal issues raised by the parties. The record is extensive. Gray was convicted in 1988 and has been challenging that conviction in some fashion ever since. The Court reviewed the complicated factual and procedural history of this case; the parties' extensive arguments in the currently controlling amended petition, answer, traverse, reply, and sur-reply, which total over 500 pages; and the thousands of pages that make up the record of the proceedings in the military courts. Gray raises nineteen grounds for federal habeas relief. Twelve of those claims fail because the military courts gave them full and fair consideration, and the remaining seven claims fail as procedurally or anticipatorily procedurally defaulted (except Claim 15) and, alternatively, on the merits (including Claim 15). The Court therefore denies Gray's petition and declines to issue a certificate of appealability.

## I. BACKGROUND[2]

### A. Offense Conduct

Gray joined the United States Army in late 1983 and was stationed in March 1984 at Fort Bragg, North Carolina. *Gray Habeas I*, Doc. 20-3 at 11, 13. On November 12, 1986, he

[2] The Court summarizes in this order the factual and procedural history of this case to provide context for its rulings, but it will not go into detail. The extensive records and transcripts of Gray's military court proceedings were submitted to the Court as part of Gray's initial federal habeas case ("the first federal habeas case") and will be cited in this order by reference to "*Gray Habeas I*" followed by the docket entry and page number. *See Gray v. Belcher*, No. 5:08-cv-03289-JTM ("*Gray Habeas I*").

"unlawfully entered a mobile home in the Fairlane Acres trailer park" near Fort Bragg "and stole several items, including a .22-caliber pistol." *United States v. Gray*, 37 M.J. 730, 736 n.6 (A.C.M.R. 1992) (*Gray I*), *supp.*, 37 M.J. 751 (A.C.M.R. 1993), *aff'd*, 51 M.J. 1 (C.A.A.F. 1999). The same month, Ms. B[3] was kidnapped near Fort Bragg and raped by a man she did not know. *Gray Habeas I*, Doc. 20-4 at 184.

On December 15, 1986, Private Laura Lee Vickery-Clay went missing from Fort Bragg. *Gray I*, 37 M.J. at 736; *see also Gray Habeas I*, Doc. 20-5 at 391. In the early morning on January 3, 1987, Private Mary Ann Lang (who later changed her last name to Nameth) was raped and repeatedly stabbed by a man she did not know in her room at Fort Bragg. *Gray Habeas I*, Doc. 20-7 at 373-78. Nameth suffered a lacerated trachea and a collapsed or punctured lung. *Gray Habeas I*, Doc. 20-8 at 255-56. She survived and was taken to a hospital. *Id.* at 255.

In January 1987, Ms. B reported to civilian law enforcement that she was kidnapped and raped the prior November. *Gray I*, 37 M.J. at 735. She also told them she had recently seen her assailant near the Fairlane Acres trailer park. *Id.* Civilian authorities set up surveillance at the trailer park and apprehended Gray on January 6, 1987. *Id.*

That evening, local cab driver Kimberly Ann Ruggles' roommate became concerned when Ruggles did not return home after leaving to pick a special fare named "Ron." *Id.; see also Gray Habeas I*, Doc. 20-6 at 196-201. The next day, military police found Ruggles' taxicab parked in the tree line near a road on Fort Bragg and, a few hours later, authorities discovered Ruggles' nude body nearby. *Gray I*, 37 M.J. at 735-36. She had been stabbed several times, raped, and sodomized, and her face and lip were bruised and lacerated. *Id.* at 736. Evidence at the scene, in the taxicab,

---

3 The attack on this woman was not charged as part of the military court proceedings at issue in this federal habeas case, so this Court follows the practice of the United States Army Court of Military Review ("ACMR") and refers to her only as "Ms. B." *See Gray I*, 37 M.J. at 735.

and in Gray's possession at the time of his arrest implicated him in the crimes. *Id.* Nameth, who was recovering in the hospital, saw Gray on television when the media reported his arrest. *Gray Habeas I*, Doc. 20-7 at 382. She recognized Gray as the man who raped and stabbed her and immediately informed authorities. *Id.*

On January 17, 1987, a group of men looking for a deer that had hit their car discovered Vickery-Clay's body. *Id.* at 40-44. She had been shot four times, raped, and anally sodomized, and she had suffered blunt force trauma to her face and body. *Gray I*, 37 M.J. at 736. Vickery-Clay's First Sergeant identified Gray as the man he had seen with Vickery-Clay on the day she disappeared, evidence in Vickery-Clay's car implicated Gray, and she had been shot with the gun Gray stole in November 1986. *Id.*

**B. State Conviction and Military Trial**

The State of North Carolina charged Gray with multiple offenses separate from those for which the Army later tried him. In accordance with a plea agreement, he pled guilty in 1987 in North Carolina state court to five counts each of first-degree sexual offense and first-degree rape; three counts of second-degree kidnapping; two counts each of second-degree murder, first-degree burglary, and robbery with a dangerous weapon; and one count each of attempted first-degree rape, assault with a deadly weapon with the intent to kill, and inflicting serious injury. *Gray I*, 37 M.J. at 733 n.1. The North Carolina state district court imposed a controlling sentence of three consecutive terms of life imprisonment. *Id.*

The military then began its prosecution of Gray. The Commander of the 82nd Airborne Division convened a general court-martial and Gray's trial took place in March and April 1988. *Gray Habeas I*, Doc. 20-3 at 12, 136. The jury convicted him of the premeditated murders of Vickery-Clay and Ruggles; the attempted premeditated murder of Nameth; the rapes of Vickery-

Clay, Nameth, and Ruggles; two counts each of robbery and forcible sodomy; and one count each of larceny and burglary. *See id.* at 3-5; *see also Gray I*, 37 M.J. at 733. On April 12, 1988, Gray was sentenced to death, a reduction in rank, forfeiture of pay and allowances, and dishonorable discharge. *Gray Habeas I*, Doc. 20-3 at 5. On July 29, 1988, the convening authority approved the sentence. *Id.*

### C. Direct Appeal

The United States Army Court of Military Review[4] ("ACMR") automatically reviewed the case as required by Article 66 of the UCMJ. *See* 10 U.S.C. § 866(b)(3). Gray asserted 26 issues to support his request for a new trial and his challenge to his sentence, but the ACMR affirmed the convictions and sentence in December 1992. *Gray I*, 37 M.J. at 733-34. The ACMR later allowed Gray to brief 28 more issues, and in June 1993 the ACMR again affirmed the convictions and sentence. *United States v. Gray*, 37 M.J. 751, 761 (A.C.M.R. 1993) (*Gray II*), *aff'd*, 51 M.J. 1 (C.A.A.F. 1999).

The United States Court of Appeals for the Armed Forces ("CAAF") then conducted further mandatory review as required by Article 67(a)(1) of the UCMJ and heard oral argument in March 1995. *See* 10 U.S.C.A. § 867(a)(1); *United States v. Gray*, 51 M.J. 1, 10 (C.A.A.F. 1999) (*Gray III*). In June 1996, before the CAAF issued its opinion, the United States Supreme Court issued its decision in *Loving v. United States*, 517 U.S. 748 (1996). *Loving* involved an Army private who was tried in a military court and sentenced to death for crimes committed in Texas. *See* 517 U.S. at 751. The CAAF then allowed Gray to brief the effect of *Loving* on his case and heard additional oral argument in December 1996. *Gray III*, 51 M.J. at 10. In total, Gray's counsel

---

[4] The United States Army Court of Military Review was later renamed the United States Army Court of Criminal Appeals. *See Gray v. Belcher*, 70 M.J. 646, 646 (A.C.C.A. 2012) ("*Gray IV*").

raised 70 issues to the CAAF and Gray personally raised an additional 31 issues under *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).[5] *Gray III*, 51 M.J. at 11, 63.

The CAAF issued a lengthy opinion in May 1999 in which a majority affirmed Gray's convictions and sentence. *Id.* at 1, 64. A minority of the court dissented from the majority's rejection of Gray's argument under *Batson v. Kentucky*, 476 U.S. 79 (1986). *Gray III*, 51 M.J. at 71 (Effron, J., dissenting). The CAAF denied Gray's petition for reconsideration and motion for rehearing in April 2000. *United States v. Gray*, 53 M.J. 242 (C.A.A.F. Daily Journal Apr. 6, 2000). The United States Supreme Court denied Gray's petition for writ of certiorari in March 2001. *Gray v. United States*, 532 U.S. 919 (2001).

**D. Presidential Approval and Collateral Attacks**

At the time the CAAF affirmed Gray's conviction, Article 71(a) of the UCMJ stated: "If the sentence of the court-martial extends to death, that part of the sentence providing for death may not be executed until approved by the President." 10 U.S.C. § 871(a) (2000) (recodified in 2019 at 10 U.S.C. § 857(a)(3)). On July 28, 2008, President George W. Bush approved Gray's death sentence and ordered the sentence executed, rendering final both military direct review and Gray's dishonorable discharge. *Gray Habeas I*, Doc. 2-1 .at 2; *see also* 10 U.S.C. § 876. The Secretary of the Army scheduled the execution for December 10, 2008. *Gray Habeas I*, Doc. 2-2, at. 2.

On November 25, 2008, Gray moved this Court to appoint counsel and stay the execution so he could file a petition for federal writ of habeas corpus. *Id.* at Doc. 2. United States Senior District Judge Richard D. Rogers granted the motion the next day and Gray's first federal habeas

[5] Under *Grostefon*, appellate counsel for an individual convicted by a military court must at least identify all issues the convicted individual requests, even if those issues do not merit extensive briefing in counsel's opinion. *See* 12 M.J. at 436 ("[W]hen the accused specifies error . . . appellate defense counsel will, at a minimum, invite the attention of the Court of Military Review to those issues . . . .").

case began. *Id.* at Doc. 7. The next 17 years of legal proceedings were a quagmire, but the salient points are as follows.

Gray filed his first federal habeas petition in April 2009, the Commandant[6] filed his answer the next month, Gray filed his traverse that December, and the Commandant filed a response to the traverse[7] in November 2010. *Gray Habeas I*, Docs. 17, 20, 42, and 48. Gray moved for leave to reply to the response and, in February 2011, while that motion was pending, he filed in the Army Court of Criminal Appeals[8] ("ACCA") a petition for writ of coram nobis ("the first coram nobis petition") that raised for the first time to the military courts seven of the issues in the pending federal habeas petition. *See id.* at Docs. 49 and 51; *see also Gray v. Belcher*, 70 M.J. 646, 647 (A.C.C.A. 2012) (*Gray IV*). These claims are referred to in this order as "the coram nobis claims."

Upon learning of the pending coram nobis petition, Judge Rogers deferred ruling on the motion for leave to reply that was pending in the first federal habeas case. *See Gray Habeas I*, Docs. 51-68. The ACCA denied the first coram nobis petition in January 2012, and the CAAF denied Gray's petition for further review three months later "without prejudice to raising the issue

[6] In federal habeas challenges to present physical confinement, the "default rule is that the proper respondent is the warden of the facility where the prisoner is being held" because the warden is the "person who has custody over [the petitioner]." *See Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (citations omitted). At the time Gray filed his petition, Colonel James W. Gray was the Commandant of the United States Disciplinary Barracks ("USDB"). Multiple individuals have served as the Commandant of the USDB during Gray's federal habeas litigation. *See Gray Habeas I*, Doc. 55 (substituting USDB Commandant Colonel Eric Belcher as respondent). To reduce confusion, the Court will refer in this order to "the Commandant" rather than identify by name the individual who held the position at the time.

[7] The Rules Governing Section 2254 Cases in the United States District Courts ("the Habeas Rules") contemplate the filing of a petition, an answer, and a reply, also called a traverse. *See* Rules 2 and 5 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254. Rule 1(b) of the Habeas Rules authorizes district courts to apply the Habeas Rules to habeas petitions not brought under § 2254, such as those brought under § 2241. Briefing other than the petition, the answer, and the traverse may be allowed at the Court's discretion.

[8] This is the court formerly known as the United States Army Court of Military Review. *See Gray v. Belcher*, 70 M.J. 646, 446 (A.C.C.A. 2012).

asserted after the U.S. District Court for the District of Kansas rules on the pending habeas petition." *See United States v. Gray*, 71 M.J. 300 (C.A.A.F. Daily Journal Apr. 17, 2012).

At that point, Judge Rogers granted Gray leave to file a reply to the response to the traverse in the first federal habeas case; Gray filed the reply in November 2012. *Gray Habeas I*, Docs. 68-69. Two years later, the case was reassigned to United States District Judge J. Thomas Marten. *Id.* at Doc. 71. Judge Marten issued a dispositive memorandum and order in September 2015 dismissing without prejudice the "unexhausted" coram nobis claims and denying the remaining claims on their merits. *Gray v. Gray*, No. 5:08-cv-3289-JTM, 2015 WL 5714260, at *28-37 (D. Kan. Sept. 29, 2015) (unpublished) (*Gray V*), *rev'd,* 645 F. App'x 624 (10th Cir. 2016) (unpublished). Gray appealed to the Tenth Circuit Court of Appeals in February 2016. *Gray Habeas I*, Doc. 96.

Just before filing his notice of appeal, however, Gray filed in the ACCA a second petition for writ of coram nobis ("the second coram nobis petition"). *See id.* at Doc. 106-1 at 2. While the second coram nobis petition was pending, the Tenth Circuit reversed the dismissal of Gray's first federal habeas petition. It held that a federal court faced with a mixed petition—meaning one that includes both exhausted claims and unexhausted claims that may yet be exhausted—may not dismiss the unexhausted claims without prejudice and deny the exhausted claims on their merits. *See Gray v. Gray*, 645 F. App'x. 624, 625-26 (10th Cir. 2016) (unpublished) (*Gray VI*). The Tenth Circuit remanded the first federal habeas case with directions to vacate the judgment and adopt one of four identified acceptable dispositions for mixed petitions. *Id.* at 626. Judge Marten vacated the judgment and ordered Gray to show cause why his entire petition should not be dismissed without prejudice to refiling after all claims in the petition were exhausted. *Gray Habeas I*, Doc. 105.

The second coram nobis petition remained pending before the ACCA, but shortly after Judge Marten issued the show cause order in the first federal habeas case, the ACCA granted the Government's motion to dismiss the second coram nobis petition. *Id.* at Doc. 106-1 at 5. Gray appealed the dismissal to the CAAF, which affirmed the dismissal "without prejudice to re-filing after the United States District Court for the District of Kansas rules on the pending petition for writ of habeas corpus." *See United States v. Gray*, 75 M.J. 368 (C.A.A.F. Daily Journal June 8, 2016). Judge Marten dismissed the first federal habeas case without prejudice in October 2016 "to allow [Gray] to fully exhaust the unexhausted claims or to resubmit the petition without those claims." *Gray Habeas I*, Doc. 111, p. 3.

Gray then filed his third petition for writ of coram nobis or, in the alternative, for writ of habeas corpus in the ACCA. *Gray v. United States*, 76 M.J. 579, 581-82 (A.C.C.A. 2017) (*Gray VII*). In May 2017, the ACCA issued an opinion holding (1) it lacked jurisdiction to grant a writ of habeas corpus; (2) it lacked jurisdiction to consider Gray's challenge to presidential action taken in his case; and (3) Gray had failed to meet all "six prerequisites for a meritorious coram nobis claim." *Id.* at 582. Despite these holdings, the ACCA considered and rejected six of the seven coram nobis claims on their merits. *Id.* at 581-82, 587-94.

Gray sought review by the CAAF, which dismissed his petition for review with prejudice in November 2017, holding that it lacked jurisdiction over a coram nobis petition filed "in a case that is final in all respects under the UCMJ." *United States v. Gray*, 77 M.J. 5, 6 (C.A.A.F. 2017) (*Gray VIII*). Gray sought review of the CAAF's decision, but the United States Supreme Court denied his petition for writ of certiorari and in August 2018 denied his petition for rehearing. *See Gray v. United States*, 585 U.S. 1054 (2018); *Gray v. United States*, 585 U.S. 1033 (2018).

Gray returned to this Court in December 2018 and filed the petition for writ of habeas corpus that began the current case. Doc. 1. The Commandant filed a response in December 2019, and Gray filed his traverse in November 2020. Docs. 17 and 28. This case was reassigned to United States District Judge Eric F. Melgren, who held a telephone status conference in January 2021 and an in-person non-evidentiary hearing in December 2021. Docs. 31 and 41. After considering additional briefing from the parties, Judge Melgren stayed this case until final resolution of two cases that were pending before the Tenth Circuit and could affect the standard of review applicable here. Doc. 46. Judge Melgren lifted the stay in October 2023 and directed the parties to submit a superseding petition, answer, and traverse in light of the decisions in those cases, which were by that point final. Doc. 50.

Gray filed his amended petition in February 2024, the Commandant filed his answer in September 2024, and Gray filed his traverse in June 2025. Docs. 55, 64, and 73. With Judge Melgren's permission, the Commandant filed a reply to the traverse in July 2025, and Gray filed a sur-reply in August 2025. Docs. 76 and 79. Shortly after briefing was completed, Judge Melgren reassigned the case to the undersigned. The case is ready for disposition. Gray asserts nineteen grounds for relief in the operative amended petition. Doc. 55 at 2-4.

## II. STANDARD AND SCOPE OF REVIEW

Military prisoners may seek habeas relief from federal civilian courts under 28 U.S.C. § 2241. *Santucci v. Commandant*, 66 F.4th 844, 853 (10th Cir. 2023). Habeas review of military court proceedings in federal civilian courts is "'very limited,'" however, and affords military courts even greater deference than is given in federal habeas proceedings brought by state prisoners under 28 U.S.C. § 2254. *See id.* (quoting *Thomas v. U.S. Disciplinary Barracks*, 625 F.3d 667, 670 (10th

Cir. 2010)). This Court must consider whether Gray has satisfied certain initial procedural requirements before it may consider the merits of his claims.

**A. The Exhaustion Requirement**

Generally, a petitioner must properly exhaust a habeas claim for relief to be available. "[I]f a ground for relief was not raised in the military courts, then the district court must deem that ground waived" unless the petitioner shows "cause and actual prejudice." *See Roberts v. Callahan*, 321 F.3d 994, 995 (10th Cir. 2003) (citations omitted). In other words, "[w]e will not review petitioners' claims on the merits if they were not raised at all in the military courts." *Watson v. McCotter*, 782 F.2d 143, 145 (10th Cir. 1986) (citations omitted). The Tenth Circuit applied this well-established general requirement[9] in a precedential decision as recently as 2023. *See Santucci*, 66 F.4th at 873 n. 19 (noting that the petitioner waived an argument by abandoning it before the CAAF).

**B. Full and Fair Consideration**

Proper exhaustion of a claim in the military courts does not automatically entitle a § 2241 petitioner to a full merits review of his or her claim. If the military appellate court "'has dealt fully and fairly with an allegation raised in [a habeas] application,'" the federal district court may not "grant the writ simply to re-evaluate the evidence.'" *Id.* at 854 (quoting *Burns v. Wilson*, 346 U.S. 137, 142 (1953)). The petitioner must "show that the military tribunals have not given full and fair consideration to the[] claim" before a federal court considers the full merits of a military habeas petitioner's claim. *Id.* at 859.

[9] Narrow exceptions to the exhaustion requirement exist when exhaustion would be futile because the military courts of appeals lack authority to decide the question, *see Huschak v. Gray*, 642 F. Supp. 2d 1268, 1275-76 (D. Kan. 2009), or if the military "waive[s] that requirement where it feels that review in the federal courts is necessary," *see Middendorf v. Henry*, 425 U.S. 25, 29 n.6 (1976) (citations omitted). An exception to the exhaustion requirements also exists for jurisdictional issues, which the Court will address later in this order, in the context of Gray's jurisdictional arguments.

The reason for this deferential standard of review stems from the United States Constitution. Article I, section 8, clause 14 of the United States Constitution, also known as the "Make Rules Clause," grants Congress the power "[t]o make Rules for the Government and Regulation of the land and naval Forces." *See* U.S. CONST., art. I, § 8, cl. 14. And the deferential standard of review that exists in military habeas petitions is a recognition of the carefully calibrated balance among the coequal federal branches of government that the Constitution's text creates. The Make Rules Clause does not qualify Congress's authority to regulate military affairs and provide for military discipline. This authority is sweeping in its scope. Congress does, of course, exercise this authority in light of certain constitutional constraints, namely due process. *See Rostker v. Goldberg*, 453 U.S. 57, 67 (1981). But, even then, the "tests and limitations to be applied may differ because" the authority the Constitution gives Congress to regulate military affairs demands "deference to congressional choice." *Id.* (citation omitted).

The Tenth Circuit has identified "four factors 'helpful in determining whether [merits] review of a military conviction on habeas corpus is appropriate.'" *Santucci*, 66 F.4th at 856 (quoting *Dodson v. Zelez*, 917 F.2d 1250, 1252 (10th Cir. 1990)). Routinely called "the *Dodson* factors," these four factors act "as a coextensive aid to [the] 'determination of whether [a] federal court may reach the merits of the case'" that "illuminates the contours of the full-and-fair consideration standard . . . ." *See id.* (quoting *Roberts*, 321 F.3d at 997). The *Dodson* Factors are:

> 1. The asserted error must be of substantial constitutional dimension . . . . 2. The issue must be one of law rather than of disputed fact already determined by the military tribunals . . . . 3. Military considerations may warrant different treatment of constitutional claims . . . . 4. The military courts must give adequate consideration to the issues involved and apply proper legal standards.

*Id.* (quoting *Dodson*, 917 F.2d at 1252-53, but omitting emphasis and citations). The Tenth Circuit clarified in 2023 that military habeas "petitioners must establish—in substance—that each of the

four *Dodson* factors weighs in their favor to be eligible for full merits review of their claims." *Id.* In other words, the "failure to show that even one factor weighs in their favor is fatal to their efforts to secure full merits review" from a federal habeas court. *Id.* at 858.

### 1. **Gray Contends the Full-and-Fair-Consideration Standard is Inapplicable to His Case**

The full-and-fair-consideration standard is well-understood and is the one that federal civilian courts in the Tenth Circuit ordinarily employ. But Gray argues the Court should not apply this standard to any of his claims because he is facing what would be the first execution imposed by military courts for crimes committed within the United States during peacetime. Doc. 55 at 7, 9. He contends that applying the full-and-fair-consideration standard in this historically unprecedented context would be an unauthorized extension of the test. *Id.* at 7, 9. Gray explains that this factual distinction carries a meaningful legal difference because "death is different" and the system of justice that sentenced him to death is different in some respects from the civilian system of justice. The Commandant responds by directing the Court's attention to the United States Supreme Court's decision in *Burns v. Wilson*, 346 U.S. 137 (1953). Doc. 64 at 37.

The Court declines Gray's invitation to fashion an exception to the full-and-fair-consideration standard based on a factual distinction. The fault in Gray's argument is that while death may very well be different in many respects, it simply isn't different here. Neither is the fact that Gray committed his crimes during peacetime or that he committed them within the United States. The Commandant is correct to point the Court to *Burns*. A plurality of the Supreme Court first-fashioned the full-and-fair-consideration standard that the Tenth Circuit employs in *Burns*, which is a case with nearly the same factual conditions as Gray's own case. *Burns* involved the habeas petitions of two servicemembers whose military court trials for rapes committed on the island of Guam in 1948 had resulted in death sentences. *See Burns*, 346 U.S. at 138; *Burns v.*

*Lovett*, 103 F. Supp. 312, 312-13 (D. D.C. 1952); *Dennis v. Lovett*, 104 F. Supp. 310, 311 (D. D.C. 1952). Which is to say, the habeas petitions at issue in *Burns* had been brought by servicemembers who had been sentenced to death for committing traditionally civilian crimes during peacetime and in a United States territory.[10] And it was against these facts that Chief Justice Vinson (joined by Justices Reed, Burton, and Clark) opined that federal courts were precluded from considering the merits of habeas claims brought by those in military custody if the military courts had given the claims full and fair consideration. The Tenth Circuit has long regarded this opinion as controlling and governing federal courts' review of § 2241 petitions from those in military custody. And it has used this opinion as the basis for the multi-factor full-and-fair-consideration standard it employs.

The distinctions Gray seeks to draw to avoid application of the full-and-fair-consideration standard to his petition are illusory. The Court does not agree that Gray's case is materially distinguishable from *Burns* simply because Gray committed his crimes in the continental United States whereas *Burns* involved a United States territory. Indeed, there is no textual evidence in Article I (or anywhere else in the United States Constitution) that Congressional authority to regulate the military is cabined by geography. Gray certainly does not point to any. He likewise does not point to any binding authority that requires the Court to adopt a different standard of review depending on geography.

Drawing the line Gray wants would also put the Court at odds with Congress's constitutional prerogative under Article I to regulate the military and, incidentally, to define the

---

[10] The island of Guam did not become a United States Territory until the passage of the Guam Organic Act of 1950. *See* 48 U.S.C. 1421. But it became a United States possession after the 1898 Treaty of Paris, which ended the Spanish-American War. *See* Treaty of Peace Between the United States of America and the Kingdom of Spain, Spain-U.S., Dec. 10, 1898, T.S. No. 343. As a matter of United States law, Guam formally remained under the control of the Department of the Navy by executive order until 1949. *See* Exec. Order No. 10137, 3 C.F.R. 320 (1949-1953); Exec. Order No. 10077, 3 C.F.R. 279 (1949-1953).

range of crimes and punishments to which members of the military may be subject. *See Weiss v. United States*, 510 U.S. 163, 177 (1994) ("[T]he Constitution contemplates that Congress has plenary control over rights, duties, and responsibilities in the framework of the Military Establishment, including regulations, procedures, and remedies related to military discipline." (citation and internal quotation omitted)). The deference shown by civilian courts in assessing the right to habeas relief provided to military prisoners by statute under § 2241 reflects the balance struck between the essentially plenary authority given Congress and the acknowledgment that a mechanism must exist for the vindication of military prisoners' substantial constitutional claims. *See Santucci v. Commandant*, 66 F.4th 844, 854 (10th Cir. 2023) (discussing the plurality opinion in *Burns*). As the Tenth Circuit recently reiterated in *Santucci*, "Congress's power to vest military courts with the authority to rule on court-martial cases 'is given without any connection'" to Article III and "Congress . . . has largely exempted the court-martial from direct Article III review." *See id.* at 852-53 (citations omitted). Because the Court finds *Santucci* and *Burns* require that the full-and-fair-consideration standard applies in this case, it need not address in detail Gray's other initial arguments against application of the full-and-fair-consideration test.[11]

---

[11] The Court notes Gray's argument that this Court should carefully examine centuries of history "to determine the constitutional balance of jurisdiction between the military and civilian courts relative to various classes of defendants and crimes." *See* Doc. 55, p. 6. But such a searching form of review is unnecessary because Article I's flexible and broad grant of regulatory authority over military affairs is "straightforward." *See Loving*, 517 U.S. 748, 775-76 (1996) (Scalia, J., concurring in part and concurring in judgment) (opining that a discussion of English history is irrelevant to determining whether the Constitution allowed Congress to authorize the President to establish aggravating factors in the context of capital cases in military court because the Make Rules Clause of Article I grants Congress that power "in straightforward fashion"). The judicial imposition of limitations on how Congress may regulate military affairs based on how it has chosen to do so in the past would be in tension with the Constitution's text and would reflect a judicial arrogation to congressional prerogative.

The Court further notes Gray's argument that using the full-and-fair-consideration standard "would violate . . . the bedrock prohibition on cruel and unusual punishments." Doc. 55, p. 5. Gray appears to base this assertion on the anticipated success of his substantive claims that his Eighth Amendment rights were violated by the military court. By doing so, he conflates the question of the propriety of the full-and-fair-consideration test with the merits of his underlying claims. The Court will not determine the appropriate standard of review by whether the underlying arguments succeed on their merits; to do so would result in a de facto de novo review.

### 2. Full and Fair Consideration After *Loper Bright*[12]

Gray also argues that the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), supersedes the Tenth Circuit's reaffirmation in *Santucci* that the full-and-fair-consideration standard applies to habeas review of cases tried in military courts. Doc. 73 at 6. The Court disagrees because *Loper Bright*'s holding and its reasoning are inapplicable.

*Loper Bright* is a watershed decision that deals with federal judicial review of federal administrative agency action. Before *Loper Bright*, federal courts had adopted a deferential posture toward administrative decision making under the principles outlined in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 836 (1984), and its progeny. *See Loper Bright*, 603 U.S. at 396-98. *Loper Bright* changed that posture. Drawing on fundamental principles of judicial review, *Loper Bright* held that "*Chevron* deference" violated the Administrative Procedures Act (APA). *Id.* at 398-407.

*Loper Bright* is inapplicable to this case for at least two reasons. The first reason is that review under the APA is inapplicable to decisions of military courts. *See* 5 U.S.C. § 701(b)(1)(F). Principles of judicial deference to military courts cannot violate the principles of judicial review provided for under the APA because the APA does not provide the source of review. The second reason is that the source of judicial deference to a military court's decision is not the *Chevron* doctrine, which is what *Loper Bright* overruled. As explained above, the full-and-fair-consideration analysis comes from the authority given to Congress to make rules for the military's regulation under Article I. *See Santucci*, 66 F.4th at 852-56 (discussing the genesis of full-and-

[12] Gray raises this argument in his traverse. The Court generally does not allow a habeas petitioner to raise arguments for the first time in a traverse. To the contrary, "[c]ourts routinely refuse to consider arguments first raised in a habeas traverse." *Martinez v. Kansas*, No. 5:05-cv-3415-MLB, 2006 WL 3350653, at *2 (D. Kan. Nov. 17, 2006) (unpublished order) (collecting cases); *see also LaPointe v. Schmidt*, No. 5:14-cv-3161-JWB, 2019 WL 5622421, at *5 (D. Kan. Oct. 31, 2019) (unpublished memorandum and order) (striking new claim from traverse). But in this case Judge Melgren granted the parties leave to further explore this issue. Docs. 75 and 78.

fair-consideration standard in federal habeas review of military courts). And it was first articulated in a plurality opinion thirty years before *Chevron* was decided.

*Loper Bright* does not supersede *Santucci*.[13] It does not affect the standard of review the Court employs in this case. The Court remains bound to apply the full-and-fair-consideration standard.

## III. ANALYSIS

Gray asserts 19 claims for relief. The Court attempts to group them to the extent possible.

### A. Claim 1

Gray argues in Claim 1 that "[t]he military courts lacked jurisdiction to capitally prosecute [him] for crimes committed in the United States during peacetime because Congress's ostensible grant of jurisdiction to prosecute such crimes under the UCMJ violated the separation of powers and the Fifth, Sixth, and Eighth Amendments." Doc. 55 at 31. In support, he focuses on the historical roles of military courts and the lack of express authorization in the UCMJ for capital prosecution of domestic peacetime crimes in the military courts. Doc. 55 at 7-15, 31-33. As Gray concedes, he did not raise this argument to the military courts. Doc. 55 at 9; Doc. 73 at 16-17. The Commandant initially responds that this Court should decline to consider the merits of this jurisdictional argument because Gray failed to properly exhaust it in the military courts. Doc. 64 at 38-40. The Commandant also contends that this argument fails on the merits. *Id.* at 40-41.

The Court carefully considered the parties' in-depth arguments regarding Congress' Constitutional authority to authorize prosecution in military courts, the history of military courts, and the interactions between military courts and civilian courts. But resolution of Claim 1 does not

---

[13] The conclusion that *Loper Bright* is inapplicable is consistent with other courts that have addressed *Loper Bright*'s impact on federal habeas practice under § 2254. Those courts have concluded *Loper Bright* does not have any impact. *See Piper v. Att'y General for S.D.*, 174 F.4th 1070, 1076 (8th Cir. 2026) (collecting cases).

require the Court to recite the particulars of these arguments or weigh their merits. This Court is bound to follow controlling Tenth Circuit and United States Supreme Court precedent, which provide an answer on both exhaustion and jurisdiction.

"The general rule is that if a ground for relief was not raised in the military courts, then the district court must deem the ground waived." *Laughrey v. Commandant*, No. 24-3073, 2026 WL 2859611, at *2 (10th Cir. 2026) (citation and internal quotation omitted) (unpublished order and judgment). And if the petitioner would be barred from returning to the military courts and pursuing relief there, the Court can apply an anticipatory procedural bar to the ground and dismiss it with prejudice. *See Gray VI*, 645 F. App'x 624, 626 (10th Cir. 2016) (unpublished). There is an exception where the petitioner shows cause and actual prejudice. *Laughrey*, 2026 WL 2859611, at *2. And the exhaustion requirement may be set aside for "constitutional claim[s] challenging courts-martial jurisdiction over classes of civilians." *Id.*

Here, it is uncontroversial that Gray was not a civilian when he committed his crimes. And Gray was not a civilian when he was tried for his crimes. Gray was a servicemember at all relevant times. Gray does not argue otherwise. And the record does not reflect either cause or actual prejudice for his failure to raise his jurisdictional challenges before the military courts. The Court therefore denies Gray's jurisdictional claims as barred by anticipatory procedural default.

But, even if the Court excused Gray's failure to properly exhaust and the anticipatory procedural bar, his jurisdictional claims still fail on the merits. Constitutionally speaking, the jurisdictional question turns solely on Gray's servicemember status. "In an unbroken line of decisions from 1866 to 1960, [the United States Supreme] Court interpreted the Constitution as conditioning the proper exercise of court-martial jurisdiction over an offense on one factor: the military status of the accused." *Solorio v. United States*, 483 U.S. 435, 439 (1987) (internal citation

omitted). "[D]eterminations concerning the scope of court-martial jurisdiction over offenses committed by servicemen was a matter reserved for Congress," and the Constitution limited military courts' jurisdiction only by requiring that "the accused in the court-martial proceeding is a person who can be regarded as falling within the term 'land and naval Forces.'" *Id.* at 439-40 (citation omitted). *See also Laughrey*, 2026 WL 2859611, at *3; *Wilson v. Curtis*, 150 F.4th 1359, 1364 (10th Cir. 2025). Which is to say, whether Gray could have been "constitutionally subjected to court-martial jurisdiction turns 'on one factor: [his] military status [as] the accused.'" *See Wilson*, 150 F.4th at 1364 (quoting *Solorio*, 483 U.S. at 439). And because Gray was a servicemember at all relevant times, it was constitutionally permissible for him to be subjected to military court jurisdiction. Gray thus cannot obtain federal habeas relief on Claim 1.

**B. Claims 2-6, 8-9, 11-14, and 18 – Full and Fair Consideration**

Gray raised most of his claims to the military courts, so the Court applies the *Dodson* factors to determine whether it may reach the merits of these claims. As explained above, this Court may conduct a full merits review of an issue resolved by the military courts only if the issue (1) asserts an error "of substantial constitutional dimension"; (2) is an issue of law, not an issue of disputed fact; (3) does "not implicate unique military considerations"; and (4) the military courts failed to "give adequate consideration to the issues involved and apply proper legal standards." *See Santucci v. Commandant*, 66 F.4th 844, 856-57 (10th Cir. 2023) (quotations and citations omitted). "As the party seeking relief, [Gray] bears the ultimate burden of persuasion." *See id.* at 867. The "failure to show that even one factor weighs in [Gray's] favor is fatal to [his] efforts to secure full merits review." *See id.* at 858.

In addition, the Tenth Circuit has distinguished between determining whether military courts gave full and fair consideration to issues and deciding whether this Court would have come

to the same conclusion as the military courts. *See Drinkert v. Payne*, 90 F.4th 1043, 1046 (10th Cir. 2024) ("When we say that a military court has fully and fairly considered an issue, we are not saying that we agree with the court's reasoning."). When determining whether an issue was afforded full and fair consideration by a military court, "we ordinarily focus only on how the issue was presented to the military court, without considering that court's reasoning, or even its conclusion." *Id.* at 1046-47 (citation omitted). "It would make no sense to interpret *Dodson* to say that we need to assess the merits to determine whether to review the merits." *Id.* at 1048. Thus, the Court rejects Gray's arguments that mistakes in a military court's analysis demonstrate that it did not give his claims full and fair consideration.

Relatedly, the Tenth Circuit also "has consistently held full and fair consideration does not require a detailed opinion by the military court." *Thomas v. U.S. Disciplinary Barracks*, 625 F.3d 667, 671 (10th Cir. 2010). If "an issue is briefed and argued before a military board of review," federal courts sitting in habeas review "have held that the military tribunal has given the claim fair consideration," even when the military court "summarily disposed of the issue with the mere statement that it did not consider the issue meritorious or requiring discussion." *Id.* (quoting *Watson v. McCotter*, 782 F.2d 143, 145 (10th Cir. 1986)).[14]

---

[14] This principle forecloses Gray's argument that the summary nature of the military courts' rulings on certain issues implies that those issues were not fully and fairly considered. *See* Doc. 55 at 103. Gray argues the "CAAF did not fully and fairly consider [his] claims by citing *Matthews* without analysis and without considering the unique aspects of this case; 'the adequacy of the [military court's] consideration was not indicated by [such a] formulary order.' (internal quotations omitted)." Doc. 55 at 103 (quoting *Santucci*, 66 F.4th at 858). This quoted statement from *Santucci* refers to another Tenth Circuit opinion, namely *Khan v. Hart*, 943 F.2d 1261 (10th Cir. 1991). *Khan* found that merits review was appropriate in part because it was unclear from the Court of Military Appeals' "formulary" order whether it had considered the issue before the Tenth Circuit. Even though it found full and fair consideration had not been given with respect to the issue before it, the Tenth Circuit in *Khan* nevertheless indicated through its own citation to a prior Tenth Circuit opinion in *King v. Mosley*, 430 F.2d 732 (10th Cir. 1970), that full and fair consideration does not demand detailed, comprehensive analysis, or indeed anything beyond an indication that a military appellate court had given consideration to the argument and rejected it. *King*, which *Khan* (and by extension *Santucci*) relied on, found that full and fair consideration had been given certain issues where a military appeals court had summarily disposed of certain issues posed to it with the statement that it did not find them "meritorious [or] requiring discussion" after they had been "extensively briefed and ably argued." *King*, 430 F.2d at 734.

Finally, the Tenth Circuit has explained that issues that are highly fact-dependent and involve weighing the effects of even undisputed events may be determined to run afoul of the second *Dodson* factor, which requires that the issue be one of law rather than of disputed fact. *See Drinkert*, 90 F.4th at 1048 (finding an issue involving the admission of hearsay "was not one of pure law" because the petitioner's complaint "rests on misconstruing the implications of [the] cross-examination of the witness, an issue that is more factual than legal").

With these principles in mind, the Court turns now to the claims on which it must deny relief because the military courts fully and fairly considered them.

- **Claim 2.** Gray argues that the convening authority's selection as jury members of subordinates from within his command structure violated the Fifth and Eighth Amendments. Doc. 55 at 33. Gray raised these arguments to the CAAF during direct review, and the CAAF rejected them. *See Gray Habeas I*, Doc. 20-16 at 440; *Gray III*, 51 M.J. 1, 60 (C.A.A.F. 1999). The potential effect of jurors' placement within a military command structure implicates unique military considerations, so the third *Dodson* factor weighs against a merits review. Additionally, the CAAF gave adequate consideration to the issues involved and applied proper legal standards, so the fourth *Dodson* factor weighs against a merits review.

- **Claim 3.** Gray argues that he was denied the right to a fair and impartial jury when the military judge improperly granted two government challenges for cause. Doc. 55 at 42. He raised this claim to the CAAF during direct review, and the CAAF rejected it. *See Gray Habeas I*, Doc. 20-16 at 218-34; *Gray III*, 51 M.J. at 31-32. This claim involves interpretation and weighing of facts—the potential jury members' answers in voir dire—and thus is not a pure question of law, so the second *Dodson* factor weighs against a merits review. Additionally, the CAAF gave this claim adequate consideration, so the fourth *Dodson* factor weighs against a merits review.

- **Claim 4.** Gray argues that the trial court violated the constitutional rights recognized in *Batson v. Kentucky*, 476 U.S. 79 (1986), by permitting a peremptory strike without first requiring the prosecutor to present a race-neutral explanation. Doc. 55 at 54. He raised this claim to the CAAF during direct review, and the CAAF rejected it. *See Gray Habeas I*, Doc. 20-16, p. 235-45; *Gray III*, 51 M.J. at 32-35. The CAAF gave this claim adequate consideration, so the fourth *Dodson* factor weighs against a merits review.

- **Claim 5.** Gray argues that the lack of women in the venire violated his rights under the Fifth, Sixth, and Eighth Amendments. Doc. 55 at 67. He challenged the lack of women in

the venire during direct review to the CAAF,[15] and the CAAF rejected his argument as unsupported. *See Gray Habeas I*, Doc. 20-16 at 344-54; *Gray III*, 51 M.J. at 49. The CAAF fully and fairly considered this argument, so the fourth *Dodson* factor weighs against a merits review.

- **Claim 6.** Gray argues that his Fifth, Sixth, and Eighth Amendment rights were violated when he was sentenced to death by a six-man jury. Doc. 55 at 68. He made this argument to the CAAF on direct review, and the CAAF rejected it. *See Gray Habeas I*, Doc. 20-16 at 337; *Gray III*, 51 M.J. at 49. The CAAF gave adequate consideration to this argument, so the fourth *Dodson* factor weighs against a merits review.

- **Claim 8.** Gray argues that the UCMJ's prohibition on guilty pleas in capital proceedings violated his rights under the Fifth, Sixth, and Eighth Amendments. Doc. 55 at 94. He challenged the prohibition of guilty pleas for capital charges in military courts in his direct appeal to the CAAF,[16] and the CAAF rejected the argument. *See Gray Habeas I*, Doc. 20-16 at 336; *Gray III*, 51 M.J. at 49. The CAAF gave Gray's arguments adequate consideration, so the fourth *Dodson* factor weighs against a merits review.

- **Claim 9.** Gray argues that Congress unconstitutionally delegated to the President, and the President unconstitutionally exercised, the power to enact aggravating factors which are the functional equivalent of elements of capital murder. Doc. 55 at 104. He made these arguments to the CAAF in his direct appeal, and the CAAF rejected them. *See Gray Habeas I*, Doc. 20-16 at 408-28; *Gray III*, 51 M.J. at 59. The CAAF gave Gray's arguments adequate consideration, so the fourth *Dodson* factor weighs against a merits review.

- **Claim 11.** Gray argues that sentencing counsel was ineffective and violated his Sixth Amendment right to effective assistance of counsel at sentencing. Doc. 55 at 140. He acknowledges that he raised an ineffective-assistance-of-sentencing-counsel claim[17] to the

---

[15] The record reflects Gray argued to the CAAF only that the lack of women in the venire violated his Fifth and Sixth Amendment rights; he made no mention of the Eighth Amendment. *See Gray Habeas Is*, Doc. 20-26 at 344-54; *see also Gray III*, 51 M.J. at 49. The Commandant does not argue the failure to exhaust Claim 5, instead choosing to restate Claim 5 as asserting that the lack of female venire members rendered Gray's trial, conviction, or sentence "constitutionally questionable." Doc. 64 at 91-96. Therefore, the Court will not further address Gray's failure to exhaust his Eighth Amendment argument in Claim 5. *See Valois v. Commandant*, No. 5:13-cv-3029-KHV, 2015 WL 5837658, at *3 (D. Kan. Oct. 7, 2015) (unpublished memorandum and order) ("Because respondent has not raised failure to exhaust as a defense, the Court deems it waived and shall address the merits of [the] habeas corpus petition."), *aff'd* 638 F. App'x 796 (10th Cir. 2016).

[16] The record reflects Gray did not argue to the CAAF that this prohibition violated his rights under the Fifth, Sixth, or Eighth Amendments. *See Gray Habeas I*, Doc. 20-16 at 336. Again, however, because the Commandant has not raised the affirmative defense of failure to exhaust, the Court does not address it in detail.

[17] Despite this acknowledgment, Gray also asserts that Claim 11 was <u>not</u> raised during his direct appeal because the factual basis for the ineffective assistance claim now argued is "predominantly new or different" than the bases he argued in his direct appeal, was "developed by federal habeas counsel after the conclusion of the military [direct] appeal," and was raised to the military appellate courts for the first time in his third coram nobis petition. Doc. 55 at 150. Therefore, Gray argues, because the CAAF refused to consider the merits of the arguments in the third coram nobis petition, the military courts failed to give full and fair consideration to Claim 11 and this Court must review Claim 11 on its merits. Doc. 55 at 150-51. Gray's reasoning does not withstand scrutiny. Gray argues to this Court that his counsel was ineffective by failing to reasonably investigate Gray's background and failing

CAAF in his direct appeal, and the CAAF rejected the claim. *Id.* at 146; *see also Gray Habeas I*, Doc. 20-16 at 123-38; *see Gray III*, 51 M.J. at 18-19. This claim involves interpretation and weighing of facts and thus is not a pure question of law, so the second *Dodson* factor weighs against a merits review. Additionally, the CAAF gave this claim adequate consideration, so the fourth *Dodson* factor weighs against a merits review.

- **Claim 12.** Gray argues that the military judge violated his Fifth, Sixth, and Eighth Amendment rights by refusing to allow defense counsel to show to the jury during the penalty phase a television show concerning the city in which Gray grew up. Doc. 55 at 151-52. Gray challenged the military judge's ruling on the videotape as part of his direct appeal,[18] and the CAAF rejected the challenge. *See Gray Habeas I*, Doc. 20-16 at 270; *Gray III*, 51 M.J. at 39. This claim is fact intensive, so the second *Dodson* factor weighs against a merits review. Additionally, the CAAF gave it adequate consideration, so the fourth *Dodson* factor weighs against a merits review.

- **Claim 13.** Gray argues that the military judge's failure to grant a mistrial after the prosecutor commented on Gray's failure to show remorse violated Gray's Fifth Amendment rights. Doc. 55 at 158. He and the Commandant agree that this issue was fully raised in the direct appeal, and that the appellate military courts rejected it. Doc. 55 at 162; Doc. 64 at 119; *see also Gray III*, 51 M.J. at 38-39; *Gray I*, 37 M.J. 730, 747-48 (A.C.M.R. 1992). The appellate military courts gave this issue adequate consideration, so the fourth *Dodson* factor weighs against full merits review.

- **Claim 14.** Gray argues that the military judge's jury instructions violated his Fifth and Eighth Amendment rights. Doc. 55 at 163. He points to (1) the military judge's failure to instruct the jury how to weigh aggravating factors against mitigating factors in light of the fact that Gray was convicted of multiple crimes and (2) the military judge's failure to define "substantially outweigh" as that phrase was used to instruct the jury that they could not adjudge a death sentence unless they found that any mitigating factors were "substantially outweighed" by any aggravating factors. *Id.* at 164-65. Gray raised these issues as part of his direct appeal, and the CAAF rejected his arguments. *See Gray Habeas I*, Doc. 20-16 at 282-97; *Gray III*, 51 M.J. at 42-45. The CAAF gave adequate consideration to Gray's arguments on these points, so the fourth *Dodson* factor weighs against full merits review.

- **Claim 18.** Gray argues that the proportionality review undertaken in his case was insufficient as a matter of law and violated his rights under the Fifth, Sixth, and Eighth Amendments. Doc. 55 at 192. Gray raised this claim as part of his direct appeal and the

---

to present available and significant mitigating evidence to either the jury, the sanity board, or defense experts. *Id.* at 140-50. These arguments were presented to the military courts, which repeatedly and thoroughly considered and rejected them. Although federal habeas counsel later developed additional facts to support the arguments, the full-and-fair-consideration standard would be meaningless if a petitioner could bypass it with late-breaking and novel facts for a claim already rejected on its merits by the military courts. Gray cannot get de novo review in an Article III court by simply presenting new facts.

[18] Gray did not argue to the CAAF on this issue that his Fifth or Sixth Amendment rights were violated. *See Gray Habeas I*, Doc. 20-16 at 270-76. The Commandant has not raised the affirmative defense of failure to exhaust, so the Court does not address it further.

CAAF, which rejected it. *See Gray Habeas I*, Doc. 20-16 at 444-54; *Gray III*, 51 M.J. at 61-63. The CAAF gave adequate consideration to Gray's arguments about the proportionality review of his sentence, so the fourth *Dodson* factor weighs against full merits review.

For these reasons, the Court concludes that the military courts gave full and fair consideration to the arguments Gray presents in Claims 2, 3, 4, 5, 6, 8, 9, 11, 12, 13, 14, and 18 and this Court therefore must decline to review those claims on the merits. *See Santucci*, 66 F.4th at 871. Gray's request for federal habeas relief based on the arguments in these claims is therefore denied with prejudice.

**C. Claims 7, 10, 15-17, and 19 – Coram Nobis**

This leaves Claims 7, 10, 15, 16, 17, and 19. Aspects of these claims implicate the procedural-default rule. "The procedural-default rule generally prevents a federal court from reviewing a habeas claim when the state [or, in this case, military] court declined to consider the merits of that claim based on independent and adequate . . . procedural grounds." *Smith v. Albaugh*, 921 F.3d 1261, 1267 (10th Cir. 2019) (citation and internal quotations omitted). A ground is independent if it is one that depends "on state [or, in this case, military] law, rather than federal [civilian] law, as the basis for the decision. And it is adequate if it is strictly or regularly followed and applied evenhandedly to all similar claims." *Finlayson v. State*, 6 F.4th 1235, 1238-39 (10th Cir. 2021) (citations and internal quotation omitted). A "court may excuse a procedural default if a petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law."[19] *Smith v. Allbaugh*, 921 F.3d 1261, 1267 (10th Cir. 2019) *Id.* (citation and internal quotation omitted); *see also Lips v. Commandant, U.S. Disciplinary Barracks*, 997

[19] A court also may excuse a procedural default if a petitioner "can establish that the constitutional error in [his conviction] 'has probably resulted in the conviction of one who is actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 623 (1998). Because Gray does not assert actual innocence, this basis for excusing procedural default is not discussed further.

F.2d 808, 812 (10th Cir. 1993) (discussing the cause and prejudice in connection with a military prisoner's unexhausted and anticipatorily procedurally defaulted habeas claims).

The procedural-default rule is implicated by aspects of these claims because of how and when Gray first presented them to the military court. Gray initially presented all these claims to the military court in a petition for a writ of coram nobis (which is a type of extraordinary equitable relief). This petition was not filed until after Gray's direct appeal was finished, the President had approved his death sentence, and he had filed his initial § 2241 petition in federal court. The § 2241 petition contained the coram nobis claims. The military courts initially rejected Gray's coram nobis claims because he had another remedy available to him (namely, a habeas petition under § 2241). *See Gray IV*, 70 M.J. 646, 646-48 (A.C.C.A. 2012). Judge Marten treated these claims as "unexhausted" because he thought that the military courts would entertain these claims if it were clear that habeas relief was not yet available. *See Gray VI*, 645 F. App'x 624, 625 (10th Cir. 2016) (unpublished). Proceeding under this belief, Judge Marten resolved the petition in a "hybrid" fashion; he denied the non-coram nobis claims and dismissed "without prejudice" the coram nobis claims. *See Gray V*, No. 5:08-cv-3289-JTM, 2015 WL 5714260, at *37 (D. Kan. Sept. 29, 2015) (unpublished).

The Tenth Circuit disapproved of Judge Marten's "hybrid" resolution. *See Gray VI*, 645 F. App'x at 625-26. And, meanwhile, the ACCA rejected a second coram nobis petition that had been pending while the appeal from Gray's initial § 2241 petition was being litigated in federal court. On remand, Judge Marten dismissed the § 2241 petition so that the coram nobis claims could again be presented to the military courts and litigated for a third time. The CAAF ultimately denied Gray's third coram nobis petition for lack of jurisdiction. *Gray VIII*, 77 M.J. at 6. It reasoned that

because Gray's direct appeals had concluded and his sentence had received presidential approval, the military courts no longer had jurisdiction to resolve the petition.[20] *Id.*

The salient point for Gray's instant habeas petition is that the CAAF has confirmed that there is no further avenue for relief on the grounds Gray raised in his coram nobis petition (which he presents here as claims 7, 10, 15-17, and 19). The CAAF rejected Gray's coram nobis petition on jurisdictional grounds. The CAAF was explicit that Gray had "exhausted all of his remedies in the military justice system," and that "[i]n the absence of any statutory authority to provide" the "extraordinary relief" he sought, there was no jurisdiction to hear the coram nobis petition. *Id*. The upshot is that Gray's coram nobis claims are procedurally defaulted and can't be heard absent a showing of cause and prejudice. But, even if they were not barred or Gray could demonstrate cause for the default, the claims still fail on their merits. The Court works through these issues below.

### 1. Claim 7

Gray argues in Claim 7 that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated because (1) he was not mentally competent to stand trial or participate in his appeal, (2) the military courts failed to conduct adversarial competency hearings, and (3) trial and appellate counsel ineffectively investigated and litigated his competence. Doc. 55 at 81. This claim presents a mix of issues. Some of these issues were raised on direct appeal and were

---

[20] Whether the claims have been exhausted is an issue that is related to but distinct from whether the claims have been "defaulted." As discussed above, exhausted claims in the context of habeas petitions are claims that have been presented to state (in this case military courts) and, for one reason or another, have been rejected. A claim that was rejected as untimely or out of sequence procedurally is still considered "technically exhausted," even though it wasn't resolved on the merits. *Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006) ("In habeas, state-court remedies are described as having been 'exhausted' when they are no longer available regardless of the reason for their unavailability." (citation omitted)). Unexhausted claims by contrast are claims that have never been presented. While exhausted claims whose rejection in state or military courts on independent and adequate procedural grounds are procedurally defaulted and barred, unexhausted claims can be barred anticipatorily for essentially the same reason. A federal court can refuse to hear an unexhausted claim and dismiss it with prejudice by reasoning that if the petitioner were to go back to the state or military courts those courts would treat the claim as procedurally improper and reject it on that basis.

fully and fairly considered by the military courts. The fully-and-fairly-considered issues include Gray's mental competence to stand trial and participate in his appeal and his trial counsel's effectiveness in investigating and litigating his competence. The Court therefore denies relief on these issues under the full-and-fair-consideration standard. The remaining issues were presented to the military courts for the first time in Gray's coram nobis petition and are defaulted absent some showing of cause and prejudice. These include the lack of adversarial competency hearings and the effectiveness of his appellate counsel's litigation and investigation of his competency. Alternatively, all aspects of this claim fail on the merits.

Before analyzing each aspect, some additional background information is necessary. In November 1987, before Gray's trial, forensic psychiatrist Dr. Selwyn Rose met with Gray in relation to Gray's North Carolina state-court prosecution. *See Gray Habeas I*, Doc. 20-4 at 100-01; Doc. 20-10 at 49-50. Dr. Rose concluded that Gray "was severely mentally ill," so he wrote to Gray's military defense counsel and opined that Gray was not competent to stand trial. Doc. 1-3 at 81-83. Defense counsel promptly requested a sanity board, and the convening authority ordered an inquiry under R.C.M. 706. *Gray Habeas I*, Doc. 20-2 at 128; Doc. 20-4 at 91. The sanity board reviewed relevant records, and sanity board president David T. Armitage, M.D., J.D. conducted an in-person psychiatric evaluation of Gray in January 1988. *Id.* at Doc. 20-3 at 125-27. With defense counsel's agreement, Dr. Armitage submitted a written report in February 1998 finding in relevant part that "Gray presently suffers from a mental disease or def[e]ct but it does not render him mentally incompetent to the extent that he is unable to understand the nature of the proceedings or to conduct or cooperate intelligently in his defense." *Id.* at 125-26.

During Gray's April 1988 trial, Dr. Rose testified that he had met with Gray again in February 1988 and found Gray "much more together, much more aware of reality and much better

able to communicate." *Id.* at Doc. 20-10 at 51. The military judge asked Dr. Rose: "[A]s [Gray] sits before you today, . . . in your considered opinion, does he have the mental capacity to understand the nature of these proceedings and conduct or cooperate intelligently in that defense?" *Id.* at 78. Dr. Rose responded, "Yes, he does." *Id.*

After Gray was convicted, he was incarcerated at the United States Disciplinary Barracks, where Dr. William P. Kea was the chief psychologist. *See* Doc. 1-2 at 63. At the request of Gray's appellate counsel, Dr. Kea met with Gray multiple times in August and September 1989, conducted a psychological evaluation, and concluded, in relevant part, that Gray had not been competent to stand trial and was not competent to participate in his appeal. *See id.* Dr. Kea reported his conclusions to Gray's appellate counsel. *See id.* at 63-64.

Appellate counsel for Gray and for the United States both asked the ACMR to order an inquiry under R.C.M. 706. *See Gray I*, 37 M.J. 730, 734 (A.C.M.R. 1992). The ACMR ordered the inquiry, and Dr. Kea was a member of the sanity board convened in June 1990. *Id.*; Doc. 1-2 at 64. The sanity board's final report reflected a unanimous[21] finding that Gray had "'sufficient mental capacity to understand the nature of the court-martial proceedings and to conduct or cooperate intelligently at the time of the trial'" and he "'presently possesses sufficient mental capacity to understand the nature of the pending appellate proceedings and to conduct or cooperate intelligently in his appeal.'" *Gray I*, 37 M.J. at 734. With the relevant case history in mind, the Court turns to the merits of Gray's arguments in Claim 7 of this federal habeas case.

[21] The Court is aware that Dr. Kea later provided information regarding his reluctance to join this finding. The fact remains, however, that the sanity board submitted to the ACMR a report that reflected unanimous findings.

**a. Lack of a Competency Hearing**

Subjecting a mentally incompetent defendant to trial violates the Fifth Amendment's Due Process Clause. *United States v. Landa-Arevalo*, 104 F.4th 1246, 1252-53 (10th Cir. 2024). The Fifth Amendment requires that criminal defendants be competent to stand trial. *Id.* This is both a procedural and substantive due process requirement. *Id.* The right to due process is violated as a procedural matter when a court does not hold "an adequate competency hearing." *Id.* It is violated as a substantive matter when a defendant is tried while incompetent. *Id.*

As a matter of procedural due process, Gray argues that his constitutional rights were violated by a failure to conduct adversarial competency hearings both at trial and during his appeal.[22] He argues that the military court was obligated to sua sponte "conduct a competency proceeding[] because it was aware, or reasonably should have been aware, of indicia of incompetence." Doc. 55 at 92. In support, Gray points to information in the 1987 defense request for a sanity board and Dr. Rose's 1987 letter that prompted it, which was submitted to the military trial court before trial. *Id.* (citing Doc. 1-3 at 85-88 and *Gray Habeas I*, Doc. 20-4 at 100). Gray also contends there were persistent indicia of his incompetence during his direct appeals in the military courts.

There are a couple of problems with this argument. The first problem is that Gray has procedurally defaulted the issue. Based on the Court's review of the record, it does not appear that Gray contemporaneously challenged whether the competency board proceeding to which he was subject under the UCMJ comported with the Fifth Amendment's procedural due process

[22] Gray refers to the military courts' "refusal" to hold adversarial competency hearings violated his constitutional rights. *See* Doc. 55 at 85 (characterizing the issue as "the military courts' *refusal* to . . . hold an adversarial proceeding to consider [his] competency" (emphasis added)). The record reflects, however, no point at which any counsel requested an adversarial competency hearing. And at another point in his amended petition, however, Gray concedes that "counsel never requested a competency hearing before the [military] court." *Id.* at 85. To be clear, the military court did not refuse to hold a competency hearing; it was never faced with a request to do so.

requirements. It appears that the first time Gray presented this issue to the military courts was in his petition for writ of coram nobis. That petition was ultimately dismissed for lack of jurisdiction by the CAAF. This was an independent and adequate procedural basis for resolving the issue. And Gray does not offer compelling cause for why the claim was not raised on direct review.

The second problem is that even if cause existed to excuse the default, the claim would still fail on the merits. As an initial matter, the Court is unaware of any binding appellate authority that extends the requirement that a criminal defendant be competent during trial to the pendency of his direct appeal. The Supreme Court in *Ryan v. Gonzalez*, 568 U.S. 57 (2013), rejected out of hand any suggestion that due process is implicated when defendants are incompetent during habeas proceedings and refused to find a right to competence as part of the Sixth Amendment right to counsel. *Id.* at 65-67. And at least one observer has remarked that the *Ryan* Court's reasoning "suggests that criminal defendants have no right to competence on direct appeal . . . ." 6 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 24.2(g) (5th ed. Nov. 2025 Update). So, to whatever extent Gray complains about the constitutional deprivation of his right to competence in the military courts, the existing case law suggests that his claim would only reach as far as his right to competence during the trial proceedings.

But even assuming a due process right to competency at all stages of the proceedings (trial and appeal), the process Gray received was not constitutionally inadequate. The procedural due process right to a competency hearing places an obligation on trial courts to conduct (sua sponte if necessary) a "sanity hearing where the evidence raise[s] a bona fide doubt as to the defendant's competence to stand trial." *United States v. Cornejo-Sandoval*, 564 F.3d 1225, 1233 (10th Cir. 2009) (citation and internal quotation omitted). The focus of such an inquiry is "the defendant's mental capacity," and "the question is whether [he] has the ability to understand the proceedings."

*United States v. Williams*, 113 F.3d 1155, 1159 (10th Cir. 1997) (citation and internal quotation omitted). This is a "modest aim," and one that "seeks to ensure that [the defendant] has the capacity to understand the proceedings and to assist counsel." *Id.* The military trial court did have Gray's competency assessed under R.C.M. 706 based on the 1987 letter from Dr. Rose and defense counsel's request for a sanity board. Similarly, the military appellate court ordered an investigation into Gray's competency, also under R.C.M. 706. All the sanity boards concluded that Gray was competent to proceed.

Gray identifies no legal authority in effect at the time of his trial or direct appeal that supports his assertion that the military courts had any obligation, constitutional or otherwise, to sua sponte decide to hold an adversarial competency hearing after a sanity board opined he was competent.[23] This is not a case in which an accused or convicted individual exhibited signs of incompetence that a trial or appellate court ignored or refused to investigate. Rather, Gray underwent evaluation and examination multiple times, all of which resulted in findings that he was competent. And Gray's reliance in his argument to this Court upon opinions of doctors who examined Gray in 2009 and retroactively opined he was not competent at trial or during his appeal is misplaced.[24] *See Allen v. Mullin*, 368 F.3d 1220, 1238 (10th Cir. 2004) ("The results of a 1997 [competency] examination do not inform a debate about the propriety of a 1987 decision [by the

---

23 The Court notes that at the time of Gray's trial and most of his direct appeal the competency hearing related provisions currently in the Rules for Courts-Martial did not exist. *See* Exec. Order No. 12473, 49 Fed. Reg. at 17203 (1984) (containing no reference in Rule 909 to a competency hearing). An Executive Order in May 1998 amended R.C.M. 909 to include the provisions related to a hearing—after Gray argued and re-argued his direct appeal to the CAAF but before the CAAF issued its decision. *See* Exec. Order No. 13086, 63 Fed. Reg. 30065, 30069 (1998).

24 Among other things, Gray relies on evaluations conducted at the request of his current federal habeas counsel that were, in part, based on clinical interviews of Gray in 2009. *See* Doc. 55 at 89-91 (citing Doc. 1-2 at 28-49 (November 2009 declaration of Dr. Pablo Stewart, M.D.) and 51-56 (December 2009 letter from Dr. Richard G. Dudley, Jr., M.D.)). Gray also points to a 2009 declaration by Dr. Kea that includes information that was not before the military courts during trial or direct appeal. *See* Doc. 55 at 92-93 (citing Doc. 2-1 at 63-68 (November 2009 declaration of Dr. William P. Kea)).

state trial court] relating to the need for a fourth mental health expert . . . ; that decision is tested by reference to contemporaneous materials, not post hoc opinions.").

The Court's careful review of the extensive records submitted in this case has discovered no events during trial or on appeal that should have prompted the military courts to do more. The Court therefore denies federal habeas relief on Gray's argument regarding adversarial competency hearings.

**b. Competence at Trial and on Appeal**

Gray also argues that whatever the adequacy of the procedural protections the military courts afforded him, he was in-fact not competent during trial or parts of his appeal. Doc. 55 at 81. This is a substantive due process argument. *See Landa-Arevalo*, 104 F.4th at 1253. Gray raised this claim before the military courts in connection with his direct appeal, and so he appears to have properly exhausted it. But having raised competency, the military courts addressed it. As the Court has already explained, both the military trial court and the ACMR ordered sanity boards under R.C.M. 706. Those boards found Gray was competent at trial and on appeal. As the ACMR noted in its 1992 opinion, Gray "had undergone extensive mental health examinations and the experts all agreed that he was mentally competent . . . ." *Gray I*, 37 M.J. at 747.

The military courts' treatment of Gray's substantive competency challenge constitutes full and fair consideration of the issue. Gray's competency claim is a question of substantial constitutional dimension, and it is not one that implicates unique military considerations. But the issue that Gray raises in Claim 7 (i.e., whether he was competent during his trial and appellate proceedings) raises a question of fact. *See Grant v. Royal*, 886 F.3d 874, 912-13 (10th Cir. 2018) (observing that the Tenth Circuit treats competency to stand trial in the § 2254 context as a question of fact to which deference is afforded). And it is a question that the military courts gave

considerable attention to both at trial and, indeed, during his direct appeal. Because the military courts gave full and fair consideration to the question of Gray's substantive competence, Gray is not entitled to habeas relief on this issue.[25] The Court therefore denies federal habeas relief on this issue.

**c. Sixth Amendment: Ineffective Assistance of Counsel**

Finally, Gray argues in Claim 7 that his trial and appellate counsel provided ineffective assistance in investigating and litigating his competence. The effectiveness of Gray's trial counsel was litigated (at least in part) before the military appellate courts on direct appeal. *See Gray III*, 51 M.J. 1, 19 (C.A.A.F. 1999) (addressing argument that counsel was ineffective for failures related to ensuring full evaluation of competence). To the extent that the military courts were presented with the issue, they rejected it, giving it full and fair consideration. *See id.* To the extent Gray did not raise this issue until his coram nobis proceedings, it is procedurally defaulted. Similarly, Gray did not argue to the military courts that appellate counsel was ineffective in investigating and litigating his competence until he filed his coram nobis petition, meaning it too is procedurally defaulted. But in any event, Gray's arguments fail on their merits.

The Court analyzes claims of ineffective assistance of counsel under the test the United States Supreme Court established in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Tryon v.*

---

25 Gray asks this Court to hold an evidentiary hearing regarding his competency during trial and direct appeal. Doc. 55 at 89. The United States Supreme Court has long "emphasized the difficulty of retrospectively determining an accused's competence to stand trial." *See Pate v. Robinson*, 383 U.S. 375, 387 (1966) (citing *Dusky v. United States*, 362 U.S. 402 (1960)). Gray's trial occurred more than 35 years ago, and his direct appeal was final more than 25 years ago. "Like the decision to grant habeas relief itself, the decision to permit new evidence must be informed by principles of comity and finality that govern every federal habeas case." *Shinn v. Ramirez*, 596 U.S. 366, 381-82 (2022) (discussing evidentiary hearings in federal habeas cases brought under 28 U.S.C. § 2254 by state prisoners). These principles do not support holding a hearing to admit new evidence and reconsider a question the military courts determined so long ago. In addition, *Burns* prohibits Gray from "mak[ing] a new record, to prove de novo in the District Court precisely the case which [he] failed to prove in the military courts." *See Burns v. Wilson* 346 U.S. 137, 146 (1953). Thus, the Court denies Gray's request for an evidentiary hearing regarding his competency during trial and direct appeal.

*Quick*, 81 F.4th 1110, 1140 (10th Cir. 2023). The standard is the same for trial counsel and appellate counsel. Under *Strickland*, "a defendant must show both [(1)] that his counsel's performance fell below an objective standard of reasonableness and [(2)] that the deficient performance prejudiced the defense." *United States v. Holloway*, 939 F.3d 1088, 1102 (10th Cir. 2019) (citation and internal quotation omitted). The Court may address the two parts of the *Strickland* test "'in any order, and failure under either is dispositive.'" *United States v. Maley*, 1 F.4th 816, 820 (10th Cir. 2021) (quoting *United States v. Barrett*, 797 F.3d 1207, 1214 (10th Cir. 2015)).

Here, even assuming that Gray's appellate counsel was ineffective in either litigating his competency on appeal, litigating his competency at trial, or in litigating his trial counsel's litigation of his competency, the need for prejudice and the military courts' factual determination that Gray was, indeed, competent both at trial and on appeal creates an insurmountable problem. To show prejudice and satisfy the second *Strickland* requirement, Gray "must show that [counsel's] errors were so serious as to deprive [him] of a fair trial" or appeal, meaning one "whose result is reliable." *Tryon*, 81 F.4th at 1141 (citations and internal quotation omitted). He must show that there is a reasonable probability (i.e., "a probability sufficient to undermine confidence in the outcome") that the result of the proceeding would have been different had counsel not erred. *Id.* (citations and internal quotation omitted). As the Tenth Circuit has recognized in the § 2254 context, the factual determination that a defendant was competent is given deference in assessing the existence of prejudice in connection with claims challenging the effectiveness of counsel in litigating competence. Essentially, if a court whose factual determinations are owed deference found that the defendant was "<u>actually competent</u>," it follows that "unconstitutional performance [of his attorneys] would not have prejudiced him." *See Grant v. Royal*, 886 F.3d 874, 911 (10th Cir. 2018)

(emphasis in original). As explained above, the military courts fully and fairly considered Gray's competency and concluded that he was competent to stand trial and proceed on appeal. Accordingly, the Court denies federal habeas relief on this portion of Claim 7 as well.

### 2. Claim 10

In Claim 10, Gray argues that his appellate counsel provided ineffective assistance with respect to investigating mitigating evidence, presenting mitigating evidence, and litigating trial counsel's ineffective assistance during the penalty phase. Doc. 55 at 106. The Commandant disagrees, pointing out that the military courts found trial counsel had not provided ineffective assistance during the penalty phase; the Commandant also argues that that appellate counsel provided adequate representation to Gray. Doc. 64 at 160-61.

The Court notes that this claim is procedurally defaulted as set forth above, but it also fails on its merits. As set forth above, to succeed on a claim of ineffective assistance of counsel, Gray "must show both [(1)] that his counsel's performance fell below an objective standard of reasonableness and [(2)] that the deficient performance prejudiced the defense." *See Holloway*, 939 F.3d at 1102.

In his direct appeal, Gray argued that "trial defense counsel was ineffective because he failed to adequately investigate the mitigating circumstances of [Gray's] traumatic family background." *See Gray I*, 37 M.J. 730, 745 (A.C.M.R. 1992). To demonstrate trial counsel's failure, Gray's appellate counsel obtained and submitted to the ACMR "affidavits from [Gray's] mother, father, sister, uncle, and aunt" and "evidence of head injuries suffered by [Gray] as a child," "beatings which may have caused organic brain damage," and his "turbulent family history, . . . includ[ing] beatings by his alcoholic stepfather and severe emotional distress from growing up in such a stressful environment." *Id.* at 745-46. Gray also argued to the ACMR that trial counsel

was ineffective for failing to present this strong mitigating evidence during sentencing. *Id.* at 746. The ACMR rejected the arguments, as did the CAAF. *Id.*; *Gray III*, 51 M.J. at 18-19.

Gray now argues to this Court that "there is a reasonable probability that [the military appellate courts] would not have affirmed [his] sentence of death if they had been provided with the mitigating information" Gray has proffered in this federal habeas action. Doc. 55 at 113-14. His argument overlooks relevant particulars of the ACMR and CAAF's opinions. In the context of his petition for new trial based on evidence of organic brain damage, Gray argued to the ACMR that he should at least receive a new sentencing hearing. *Gray I*, 37 M.J. at 743. Applying the applicable standard of review, the ACMR held: "As long as the possible mitigating evidence does not implicate the validity of the aggravating factors found by the panel, we are convinced beyond a reasonable doubt that the panel would still have imposed the death sentence." *Id.* (citation omitted).

> The five aggravating factors found were (1) the premeditated murder of PVT V–C was committed while the accused was engaged in the commission of a rape or sodomy; (2) the premeditated murder of PVT V–C was preceded by the intentional infliction of substantial mental and physical pain and suffering of the victim; (3) the premeditated murder of Ms. R was committed while the accused was engaged in the commission of a rape or sodomy; (4) the premeditated murder of Ms. R was preceded by the intentional infliction of substantial mental and physical pain and suffering of the victim; and (5) the accused has been convicted in the same case of more than one violation of Article 118, UCMJ.

*Id.* at 741 n. 8.

In light of the ACMR's express statement that only mitigating evidence that implicated the validity of the aggravating factors would leave it with reasonable doubt that the jury would have imposed the death sentence, the pertinent question for this Court is whether the mitigating evidence Gray now argues appellate counsel should have discovered and introduced implicates the validity

of the aggravated factors. The detailed and thorough evidence Gray proffers paints a heartbreaking story of abuse, neglect, trauma, and severe mental illness. *See* Doc. 55 at 114-39. It does not, however, implicate the validity of the jury's findings that Gray committed premeditated murder of Private Vickery-Clay and Ms. Ruggles during the commission of a rape or sodomy (aggravating factors 1 and 3); Gray intentionally inflicted substantial mental and physical pain and suffering on Private Vickery-Clay and Ms. Ruggles before he murdered them (aggravating factors 2 and 4); and Gray was convicted in this case of more than one count of murder (aggravating factor 5).[26] Thus, this Court cannot conclude that there is a reasonable probability that if Gray's appellate counsel had submitted this evidence to the ACMR, the ACMR would have found trial counsel ineffective.

For its part, the CAAF rejected Gray's argument that trial counsel had failed to adequately investigate mitigating circumstances in part because

> it equates failure to discover certain facts with failure to conduct a proper investigation. In addition, it ignores any role he himself may have played in remaining silent and failing to make full disclosure to his attorney on these matters. Finally, it overlooks the substantial mitigating evidence presented in this case from [Gray's] trial psychiatric experts and his family.

*Gray III*, 51 M.J. 1, 18 (C.A.A.F. 1999) (internal citations omitted). The CAAF also noted the Supreme Court's warnings against the temptations of hindsight when evaluating the effectiveness of counsel. *Id.* at 19. It denied relief on Gray's arguments regarding the ineffectiveness of trial counsel related to mitigating evidence and the sentencing phase of trial. *Id.*

Gray broadly asserts to this Court that the extensive evidence he now presents would have led to a different outcome in the CAAF on this issue, but he does not explain why. Doc. 55 at 139

---

[26] Article 118 of the UCMJ defines the crime of murder. *See* 10 U.S.C. § 918.

("The mitigating evidence described herein and in the attached exhibits, all of which could have been developed and presented at trial and on appeal, shows that [Gray] was prejudiced by counsel's failures."). Undoubtedly the CAAF would have had more information before it. But the Court remains unconvinced that there is a reasonable probability the CAAF would have altered its conclusion.

Therefore, this Court cannot agree with Gray that had appellate counsel discovered and presented the now-proffered evidence, there is a reasonable probability that the outcome of his appeal would have been different and the military appellate courts would not have affirmed his death sentence. Even assuming Gray's appellate counsel provided deficient representation, Gray has failed to show the prejudice required by *Strickland*. The Court therefore denies federal habeas relief on the grounds asserted in Claim 10.

**3. <u>Claim 15</u>**

Gray challenges the process by which the President decides whether to approve a death sentence imposed in a military court. Doc. 55 at 168. Congress has empowered the President to approve, commute, or remit a death sentence "as the President sees fit." 10 U.S.C. § 857(a)(3).[27] And a death sentence resulting from a trial in military court "may not be executed until" the President approves it. *Id.* Gray contends that a president's action on a military death sentence is "a distinctly judicial act" and therefore Gray was entitled to the same protections afforded a criminal defendant in civilian court, including the due process right to notice and an opportunity to deny or explain information considered as the basis for imposing a death sentence. Doc. 55 at 169-74. He further argues that the secretive nature of the approval process violated the Eighth Amendment's

[27] Although this provision's location in the UCMJ has changed over the years, its substance has always remained the same as relevant to Gray's case. *Compare* 10 U.S.C. § 857(a)(3) *with* 10 U.S.C. § 871(a) (2000) and 10 U.S.C. § 871(a) (1983). For ease of reference, the Court cites to its current location in Article 57 of the UCMJ.

guarantee of reliable sentencing procedure and his Sixth Amendment right to a public trial. *Id.* at 174-76.

President George W. Bush approved Gray's death sentence in 2008 after Gray's direct appeal in the military courts had come to an end. And Gray argues that President Bush's reliance upon confidential, undisclosed reports in his decision to approve Gray's death sentence violated Gray's rights to due process, a fair sentencing proceeding, a public trial, and protection from cruel and unusual punishment under the Fifth, Sixth, and Eighth Amendments to the United States Constitution. Doc. 55 at 168-76. Gray asserts that because the "reports" were never disclosed to him, he had no "opportunity to deny, contest, or explain the information contained therein." *Id.*

Gray first raised to the military courts his challenge to the presidential approval process for his death sentence in his petition for coram nobis. This is unsurprising because his sentence did not receive presidential approval until after he had completed his direct appeal in the military courts. The Court therefore assumes that cause exists for the Court to hear the claim on its merits, which is where the claim ultimately fails.

The fault in Gray's claim lies principally in its characterization of presidential approval of a military death sentence as a "judicial act" forming part of the sentencing process. This is incorrect and contrary to recent Supreme Court precedent. Indeed, as the Supreme Court explained in *Ortiz v. United States*, 585 U.S. 427, 447 n.9 (2018), as part of a larger discussion about its jurisdiction to entertain appeals from the military court system, the presidential approval requirement for military death sentences is not an exception to the rule that the CAAF's judgments are final unless the Supreme Court reverses them. In the *Ortiz* Court's view, presidential authority at the approval stage "extends only to punishment" and is "akin to relief by commutation in the federal or state system[s]." *Id.* When the President "mitigat[es] a sentence," he "cannot upset the conviction or

judgment of the CAAF." *Id.* (internal quotation omitted). Execution of the sentence may require executive approval, but the "judgment is final when judicial review [through the CAAF] is concluded." *Id.* (citation omitted).

The characterization of presidential approval as akin to commutation or clemency as distinct from the exercise of judicial power all but settles the issue. Outside the military system, the constitutionally mandated due process protections are minimal and attach to the clemency process only once the mechanism is made available. *Duvall v. Keating*, 162 F.3d 1058, 1060-61 (10th Cir. 1998). They are satisfied so long as the procedures explicitly set out in the UCMJ are followed and the procedure followed in rendering the approval decision is "not . . . wholly arbitrary, capricious or based upon whim, for example, flipping a coin." *See id.* at 1061.

The procedure for presidential approval is found in R.C.M. 1204(c)(2), which explains in relevant part:

> (A) If the Court of Appeals for the Armed Forces has affirmed a sentence that must be approved by the President before it may be executed, the Judge Advocate General shall transmit the record of trial, the decision of the Court of Criminal Appeals, the decision of the Court of Appeals for the Armed Forces, and the recommendation of the Judge Advocate General to the Secretary concerned.
>
> (B) If the Secretary concerned is the Secretary of a military department, the Secretary concerned shall forward the material received under subparagraph (A) to the Secretary of Defense, together with the recommendation of the Secretary concerned. The Secretary of Defense shall forward the material, with the recommendation of the Secretary concerned and the recommendation of the Secretary of Defense, to the President for the action of the President.

Gray does not argue that these procedures were not followed. Gray also does not argue (and the Court does not find) that these procedures drive a necessarily arbitrary result. And Gray certainly does not present evidence that the presidential approval was in fact arbitrary, capricious,

or random. Rather, Gray's central argument is that the President was given additional information and he was prevented from knowing the contents of that information. But this isn't forbidden under the R.C.M. Gray also argues that a different and more protective set of procedures should be employed. But even if he is entitled to the level of process that exists for those facing death sentences in the civilian system, this is not the standard. The Court denies Gray's request for federal habeas relief in Claim 15 on the merits.

**4. Claim 16**

Gray argues in Claim 16 that the military death penalty sentencing system violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights because his capital sentence was the result of racial discrimination. Doc. 55 at 176. Like many of the other issues Gray raised in his coram nobis petition, this issue was not presented to the military courts on direct appeal. This issue is therefore procedurally defaulted. But the claim still fails on the merits even if there was an avenue for setting aside the default.

Gray frames Claim 16 as an as-applied constitutional challenge. Doc. 55 at 176 (noting that "[t]he military death sentencing system as applied is unconstitutional where Petitioner's death sentence resulted from racial discrimination" (emphasis added)). So Gray must show that racial discrimination actually played a part in the court-martial sentencing him to death. *See United States v. Carel*, 668 F.3d 1211, 1217-18 (10th Cir. 2011). He largely relies on a 2009 declaration ("the Baldus declaration") by Professor David C. Baldus that summarizes "the results of an empirical study of racial discrimination of the death penalty in the United States Armed Forces between 1984 . . . and 2005" (Baldus study). Doc. 55 at 176-77 & n. 35-36. Gray also directs this Court to a later-published article[28] (Baldus article) that expounds upon the Baldus study.

---

28 The citation Gray provides in his brief is inaccurate. *See* Doc. 55 at 177 n.37. The Court independently located the full text of the Baldus study, which was published in the Fall 2011 issue of Northwestern University School

But even assuming solely for the sake of argument that the empirical methodology and conclusions reflected in the Baldus article are sound, neither it nor the Baldus study show that Gray's sentence resulted from racial discrimination. As the United States Supreme Court has explained, "[e]ven a sophisticated multiple-regression analysis such as the Baldus study can only demonstrate a risk that the factor of race entered into some capital sentencing decisions and a necessarily lesser risk that race entered into any particular sentencing decision." *See McCleskey v. Kemp*, 481 U.S. 279, 291 n.7 (1987) (emphasis in original). Each petit jury deciding a death sentence "is unique in its composition, and the Constitution requires that its decision rest on consideration of innumerable factors that vary according to the characteristics of the individual defendant and the facts of the particular capital case." *Id.* at 294. Gray identifies no evidence from the record that indicates his death sentence resulted from racial discrimination. Doc. 55 at 176-83. And "the Baldus study is clearly insufficient to support an inference that any of the decisionmakers in [his] case acted with discriminatory purpose."[29] *McCleskey*, 481 U.S. at 297. Even if Gray's claim were not defaulted or the default could be excused, it would still fail on the merits.

In sum, the Court denies federal habeas relief on the arguments made in Claim 16 as procedurally defaulted. Alternatively, the Court denies the request for relief in Claim 16 on the merits.

---

of Law's Journal of Criminal Law and Criminology. *See* David C. Baldus, et al., *Racial Discrimination in the Administration of the Death Penalty: The Experience of the United States Armed Force (1984-2005)*, 101 J. Crim. L. & Criminology 1227 (2011).

[29] Part V of the Baldus article presented "a case-specific quantitative and qualitative assessment of the risk of racial discrimination in ten minority-accused death-sentenced cases," including Gray's. *See* David C. Baldus, et al., *Racial Discrimination in the Administration of the Death Penalty: The Experience of the United States Armed Force (1984-2005)*, 101 J. Crim. L. & Criminology 1227, 1294-97, 1325 (2011). It concluded, however, that the risk of racial prejudice causing Gray's death sentence was lower than the risk estimate calculated in the Baldus study, which was attached to the Baldus declaration Gray submitted to this Court and upon which Gray relies. *See id.* at 1325-27; *see also* Doc. 1-4 at 104 and Doc. 55 at 179.

### 5. Claim 17

In Claim 17, Gray contends that the military death penalty violates the Eighth Amendment. Doc. 55 at 184. Specifically, he asks this Court to find that his execution would be arbitrary, capricious, and contrary to evolving standards of decency because (1) racial disparities in military capital punishment have been and continue to be "a major predictor of death sentences"; (2) excessive delays between imposition of sentence and execution undermine any legitimate penological goal of capital punishment; and (3) "the increasing rarity of executions nationwide" and the fact that the military has not executed anyone on over 50 years foreshadow the end of capital punishment in the United States as a whole. *Id.* In response, the Commandant highlights the breadth of Gray's argument and contends that this Court simply cannot find the death penalty unconstitutional as a whole. Doc. 64 at 188.

As with Gray's other coram nobis claims, this claim was first presented to the military courts after his direct appeal was completed. The petition for coram nobis in which the claim was presented was dismissed for lack of jurisdiction. Gray has procedurally defaulted this claim. And he has not offered any persuasive argument that cause exists for this Court to ignore the default. But, even if he had, the claim fails on the merits.

As the United States Supreme Court stated:

> The Eighth Amendment succinctly prohibits "[e]xcessive" sanctions. It provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." In *Weems v. United States*, 217 U.S. 349, 30 S. Ct. 544, 54 L. Ed. 793 (1910), we held that a punishment of 12 years jailed in irons at hard and painful labor for the crime of falsifying records was excessive. We explained "that it is a precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Id.*, at 367, 30 S. Ct. 544. We have repeatedly applied this proportionality precept in later cases interpreting the Eighth Amendment. See *Harmelin v. Michigan*, 501 U.S. 957, 997–998, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991) (KENNEDY, J.,

> concurring in part and concurring in judgment); see also *id.*, at 1009–1011, 111 S. Ct. 2680 (White, J., dissenting). Thus, even though "imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual," it may not be imposed as a penalty for "the 'status' of narcotic addiction," *Robinson v. California*, 370 U.S. 660, 666–667, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962), because such a sanction would be excessive. As Justice Stewart explained in *Robinson*: "Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Id.*, at 667, 82 S. Ct. 1417.
>
> A claim that punishment is excessive is judged not by the standards that prevailed in 1685 when Lord Jeffreys presided over the "Bloody Assizes" or when the Bill of Rights was adopted, but rather by those that currently prevail. As Chief Justice Warren explained in his opinion in *Trop v. Dulles*, 356 U.S. 86, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958): "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.... The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Id.*, at 100–101, 78 S. Ct. 590.

*Atkins v. Virginia*, 536 U.S. 304, 311-12 (2002) (footnote omitted).

Gray fails to persuade this Court that the Eighth Amendment's prohibition of excessive or cruel and unusual punishment acts to prevent the military from sentencing servicemembers to death. He neither acknowledges nor addresses that military courts are by their very nature different than civilian courts. Even assuming that Gray accurately represents civilian America's trend away from capital punishment, it is not a given that the military is the same. *Cf. Kennedy v. Louisiana*, 554 U.S. 945, at *5 (2008) (unpublished statement of Kennedy, J. respecting the denial of rehearing) (observing that "authorization of the death penalty in the military sphere does not indicate that the penalty is constitutional in the civilian context" and declining to "decide whether certain considerations might justify differences in the application of the Cruel and Unusual Punishments Clause to military cases" because it was not squarely before the Court). Indeed, as the Commandant points out, "special military considerations" arise in the context of the military's use of the death penalty. Doc. 64 at 187. In the absence of further explanation from Gray, the Court

declines to adopt Gray's position that the practices of civilian America demonstrate those of the military. *See also* Doc. 55 at 185-86 (relying on descriptions and analysis of civilian death row experiences to demonstrate the experiences of military death row inmates). For example, Gray's citation to discussions of civilian death row conditions of confinement is not persuasive since Gray has failed to even assert that military death row prisoners at the United States Disciplinary Barracks endure the same conditions. *See id.* at 185-87.

Because Gray has failed to persuasively argue that the evidence and the legal authority regarding the civilian death penalty he relies upon equally apply to the military context, his argument rests only on the Baldus study, the Baldus article, and the following facts: from 1951 to 1961, the average for a military court capital conviction was 4 years from sentencing to execution, the military has not executed a death sentence since 1961, and Gray has been on death row for more than 30 years.[30] Doc. 55 at 184-92. The Court concludes that Gray has failed to show that the military death penalty scheme violates the Eighth Amendment.

The Court denies federal habeas relief on the arguments articulated in Claim 17 because they were procedurally defaulted. Alternatively, the Court denies the relief sought through Claim 17 on the merits.

**6. <u>Claim 19</u>**

Gray argues in Claim 19 that cumulative effect of the trial and appeal errors asserted in each ground of the amended federal habeas petition violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, rendering his convictions and death sentence unfair and unreliable. Doc. 55 at 198. To the extent Gray raised a cumulative argument on direct appeal, *see*

---

[30] This Court will not consider Gray's argument, also presented in Claim 18, that the military courts' proportionality review was constitutionally inadequate. As noted earlier in this order, the military courts gave this argument full and fair consideration and concluded Gray's proportionality review was constitutionally sufficient.

*Gray III*, 51 M.J. 1, 61 (C.A.A.F. 1999), the CAAF fully and fairly considered it, and the Court will not address it further. To the extent that Gray could not make this argument to the military courts and assuming cause exists to excuse any procedural default, it lacks merit. Gray has not persuaded this Court that any of the claims in the amended petition demonstrate error in his proceedings in the military courts. Thus, the Court must deny federal habeas relief based on the arguments in Claim 19. *See Martinez v. Quick*, 134 F. 4th 1046, 1066 (10th Cir. 2025) (affirming denial of relief on cumulative error habeas claim where petitioner had not shown at least two errors occurred).

The Court denies Claim 19 as having been fully and fairly considered. Or, in the alternative, and in the absence of full and fair consideration, the Court denies Claim 19 on the merits.

## IV. CONCLUSION

In summary, for the reasons explained in this order, the Court finds that Claim 1 is subject to denial because the arguments therein were not properly exhausted and are subject to an anticipatory procedural default. Alternatively, Claim 1 fails on its merits because the military courts had jurisdiction to prosecute Gray for his crimes. The Court therefore denies relief on Claim 1 of the amended habeas petition. The Court further finds that it must apply the full-and-fair-consideration test to Gray's claims that were raised to the military courts. After thorough review of the record and opinions of the military courts, the Court finds that the military courts gave full and fair consideration to the arguments contained in Claims 2, 3, 4, 5, 6, 8, 9, 11, 12, 13, 14, and 18 of the amended federal habeas petition. Therefore, the Court denies relief on these claims as well.

With respect to the remaining claims, the Court finds that Claims 7, 10, 16, 17, and 19 are barred as procedurally defaulted. The Court has also considered these remaining claims as well as

Claim 15 on their merits and finds that Gray is not entitled to federal habeas relief on the basis of the arguments in Claims 7, 10, 15, 16, 17, and 19. Accordingly, the Court denies Claims 7, 10, 15, 16, 17, and 19 on their merits. In total, the Court denies the amended petition for federal habeas relief under 28 U.S.C. § 2241.

## V. CERTIFICATE OF APPEALABILITY

Under Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, "the district court must issue or deny a certificate of appealability [(COA)] when it enters a final order adverse to the applicant." *See* 28 U.S.C.A. foll. § 2254. The Tenth Circuit has held that this requirement also applies to petitions brought under 28 U.S.C. § 2241. *See Montez v. McKinna*, 208 F.3d 862, 869 (10th Cir. 2000).

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The failure to satisfy either prong requires the denial of a COA. *Id.* at 485. When the Court denies a federal habeas claim on the merits, a COA should issue "only if the applicant has made a substantial showing of the denial of a constitutional right," and the Court identifies the specific issue that meets that showing. 28 U.S.C. § 2253.

The Court concludes that its procedural rulings in this matter are not subject to debate among jurists of reason. Additionally, with respect to the claims denied on their merits, the Court finds that Gray has not made a substantial showing of the denial of a constitutional right. Therefore, the Court declines to issue a certificate of appealability.

THE COURT THEREFORE ORDERS that the amended petition (Doc. 55) is DENIED.

THE COURT FURTHER ORDERS that a certificate of appealability SHALL NOT issue.

IT IS SO ORDERED.

Dated: October 30, 2026

/s/ *Holly L. Teeter*
HOLLY L. TEETER
UNITED STATES DISTRICT JUDGE